HONOLULU ROOFING COMPANY, LTD. *v.* ALBERT M. FELIX, IRENE P. FELIX, EDWARD M. KIRK, AND SHUMAN LUMBER & SUPPLY CO., INC.

No. 4481.

MARCH 28, 1967.

RICHARDSON, C.J., CASSIDY, WIRTZ, LEWIS AND MIZUHA, J.J.

OPINION OF THE COURT BY LEWIS, J.

By this appeal, taken by defendant Shuman Lumber & Supply Co., Inc., surety on a contractor's bond, hereinafter referred to as "surety" or "Shuman," the surety (1) contests its liability to plaintiff, Honolulu Roofing Company, Ltd., which supplied materials and labor for sanding of floors, floor covering, and ceramic tile work in the construction of a residence for Albert M. Felix and his wife, hereinafter referred to as the "owners"; and (2) contests its liability to the owners.

The contractor, Edward M. Kirk, the principal on the bond, has made no appearance in the action. Service on the contractor by registered mail was ordered on the basis of an affidavit that he was residing outside the State, and the court found in its decision that this service was made. We have no occasion to consider the judgment that was entered against the contractor.

## I.

*Liability of Surety to Plaintiff.*

The judgment appealed from awarded plaintiff judgment against the surety for plaintiff's $935 claim, plus interest and an attorney's fee. But plaintiff sued to foreclose Mechanic's Lien No. 61, which was filed against the owners' property on February 26, 1963, after an affidavit of publication of notice of completion of contract was filed pursuant to R.L.H. 1955, § 193-42, the mechanic's lien law, on January 14, 1963. Plaintiff sought personal judgment against the contractor and surety on the bond if it should be adjudged that the lien was not valid, or if a deficiency should remain after sale of the property and application of the proceeds to the lien. There has been no adjudication of invalidity of the lien. Nor has there been an ascertainment of a deficiency or provision for ascertainment thereof, if any. Judgment has been entered in favor of the plaintiff against the surety on the bond without foreclosure of the lien.

We note that by its decision the court ruled, not only that judgment should be rendered against the surety, but also that: "As to Defendants Felix, the remedy against them is for the enforcement of lien." However, no provision for enforcement of the lien was made in the judgment entered on the decision.

The surety's amended specification of error 4(b)[1] presents the contention that plaintiff should not have had judgment against it by reason of the trial court having found that plaintiff had a valid lien on the property.

---

[1] This court sua sponte raised the question of the sufficiency of the original specification of errors. After hearing argument on the surety's motion for leave to amend its specification of errors, this court reserved decision on the motion. After full consideration, the motion is granted as to the matters which, as shown by the briefs and oral argument, were viewed by the parties as subject matter to be argued. The amended specifications considered in this opinion fall in that category.

Amended specifications 4(*l*) and 5(g) attack the judgment rendered in favor of plaintiff against the surety for $935, court costs and an attorney's fee of $500.

The owners conceded in their brief in this court that "in its Decision filed on July 14, 1964, the Trial Court did grant the Materialman's prayer for foreclosure." This was in connection with the surety's argument that plaintiff's "primary allegation is for the foreclosure of lien," and that plaintiff "having a valid lien, the lien should have been foreclosed." The owners made no contention in their brief that the lien was not valid—their contention was that the surety had been benefited by the property not having been sold on foreclosure, as that would have cost the surety "that much more in costs and attorneys' fees constituting damages [allowed the owners] * * * under the Decision and Judgment * * *."[2]

Plaintiff has joined in the owners' argument. Plaintiff contends that it has a right of action on the bond as a third party beneficiary. The argument goes further, and presents the position that materialmen and suppliers of labor can recover against the surety on such a bond as third party beneficiaries irrespective of any act or omission of the obligees, the owners, the contention being that defenses of the surety good against the owners, are not good against the materialmen and suppliers of labor[3] even though only a private construction contract is involved. Plaintiff cites 17 Am. Jur. 2d, *Contractors' Bonds*, § 16;[4]

---

[2] See note 3.

[3] Under this argument, instead of plaintiff pursuing its lien and the owners pursuing their right to be held harmless from the lien with the consequent involvement of the surety's defenses against the owners, the surety would be held liable to discharge the lien without regard to any of the surety's defenses. It thus becomes evident that the form of judgment as entered in the court below was not really a benefit to the surety, as it brought into the case the additional question of the surety's right to its defenses in respect of the liability for plaintiff's claim, even if it had such defenses against the owners.

[4] See also *id.* § 34.

72 C.J.S., *Principal and Surety*, § 126 at 612; *Pennsylvania Supply Co.* v. *National Casualty Co.*, 152 Pa. Super. 217, 31 A.2d 453. However, plaintiff while endeavoring to support its judgment against the surety contends at the same time that the trial court properly allowed it a $500 attorney's fee on its $935 claim.

At this point it is necessary to review the provisions of the several statutes providing for attorneys' fees. This is the subject of amended specifications 4(*l*) and 5(g) We are of the opinion that a $500 fee could not be allowed the plaintiff in an action on the bond, as distinguished from an action for foreclosure of the lien.

If the action were on the bond, R.L.H. 1965, § 219-14, would be applicable. *Allied Amusements* v. *Glover*, 40 Haw. 92. Section 219-14 provides that "in all actions of assumpsit there shall be taxed as attorneys' fees, in addition to the attorneys' fees otherwise taxable by law," a fee according to a schedule there set out, amounting in this case to about $32 if computed on the amount of the present judgment.

If the action were on the bond and this section applied, what attorney's fees would be "otherwise taxable by law"? R.L.H. 1955, § 219-16.5, as amended (Supp. 1965), would not apply as the bond contained no provision for an attorney's fee, other than the provision for holding the owners harmless from damages,[5] which obviously was not for the benefit of materialmen or suppliers of labor. Moreover, since the amendment made by S.L. 1933, c. 38, introducing into what is now section 219-14 a provision that attorneys' fees allowed pursuant to the provisions of a promissory note or other evidence of indebtedness, *i.e.,* under section 219-16.5, shall preclude the taxation of fees under section 219-14, the principal source of dual allowance of attorneys' fees in an assumpsit action has been wiped out.

---

[5] This is considered in Part II, *infra.*

R.L.H. 1955, § 193-45, a provision of the mechanic's lien law, was cited by the court in awarding the $500 fee. It reads in pertinent part as follows:

"* * * In addition to costs of the suit the judge may allow any fee or fees for legal services rendered by the attorneys for any of the parties, and apportion the same as costs for payment by and between the parties or any of them, all as to the judge seem equitable in the light of the services performed and the benefits derived therefrom by the parties respectively."

This provision must be read with the other provisions of the section of which it is a part; it has to do with suits provided for by that section. Despite the breadth of the section in respect of parties and procedure, suits under it are limited to (a) foreclosure of liens provided for by the mechanic's lien statute, and (b) claims based on contracts, express or implied, between parties. The point designated (b) is derived from the next to the last sentence of section 193-45. This contains a limiting proviso that a writ of execution (as distinguished from an equitable decree of foreclosure) "shall only issue where the claim upon which the motion therefor is based is upon a contract, express or implied, between such parties," the parties referred to being the party moving for issuance of the writ and the party against whose property it is sought to direct the writ.

No third party beneficiary claims are provided for by section 193-45. This is clear from the words "between such parties." It is evident that the legislature thereby intended to continue the policy expressed in the section as it read prior to the revision made by S.L. 1949, c. 241, which enacted the present provisions. Before this revision the section, then R.L.H. 1945, § 8773, being the original enactment as amended by S.L. 1933, c. 143, provided that attachment of property other than that subject to the lien

might be made "in case the contract for services or material upon which the lien has accrued shall. have been directly with the owner of the property * * *." Throughout, third party beneficiaries seeking relief under this section have been limited to their liens. See S.L. 1888, c. 21, § 5.

Under the present Hawaii Rules of Civil Procedure, a claim upon the bond, if allowable, of course can be joined with a claim for foreclosure of a mechanic's lien, but a claim upon the bond as a third party beneficiary will not serve as the foundation for an attorney's fee in any amount larger than that provided for by R.L.H. 1955, § 219-14, *supra,* R.L.H. 1955, § 219-16.5 being inapplicable.

It is manifest that there is an error in the judgment, which has awarded an attorney's fee under section 193-45 when that section was not put into effect by the judgment.[6] No cross-appeal was taken demanding modification of the judgment to provide for foreclosure of the lien. But since the surety, appellant herein, has specified as error the failure of the judgment to provide for foreclosure of the lien,[7] we think that consideration of this specification (amended specification No. 4(b)) is called for together with the specifications attacking the allowance of the attorney's fee (amended specifications Nos. 4(*l*) and 5(g); that the judgment should have provided for foreclosure of the lien; and that the judgment when recast in proper form will permit of the allowance of an attorney's fee for services of plaintiff's attorney in an appropriate amount.

The record calls for the result above reached. Upon study of the record, it becomes evident that plaintiff's intention in its complaint was to stand on its lien and to

---

[6] Plaintiff is mistaken in its assumption that, as stated in its brief, "failing payment by Surety Materialman [*i.e.,* plaintiff] may enforce its lien."

[7] See note 3, which shows that the form of the judgment as entered in the court below was not to the surety's benefit.

sue on the bond only if there was a deficiency. The record is more fully reviewed below in connection with the question of a deficiency judgment. At this time we note that the prayer for relief may be looked to in pointing up the issues,[8] even though under H.R.C.P., Rule 54(c), the judgment "shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." The prayer was for foreclosure of the lien, and for judgment against the surety for any deficiency which might remain after the sale of the property. And the pre-trial order, set out in Part II, did not change the posture of the case.

The surety's argument against the allowance of the attorney's fee falls when its contention that the judgment should have provided for foreclosure of the lien is sustained. The argument rested on the form of the judgment, i.e., that it was a personal judgment against the surety. Upon remand the judgment will no longer so provide. However, the surety further contends that the amount of the fee was "unreasonable and excessive." In fixing the amount the court did not confine its attention to the services in connection with the foreclosure of the lien. Therefore the amount of the fee requires redetermination.

Upon remand of the case it will be the duty of the court, at the appropriate time, to provide for foreclosure of the lien with interest thereon and an attorney's fee confined to the services in foreclosing the lien.[9] Whether the entire amount of the fee of plaintiff's attorney may be recovered over on the owners' claim against the surety is a matter not before us and on which we do not rule.[10]

---

[8] 6 Moore, *Federal Practice*, § 54.60 at 1204 (2d ed.).

[9] In the event of a deficiency judgment a fee computed on the amount of the deficiency would also be allowable pursuant to R.L.H. 1955, § 219-14.

[10] See note 36.

We now consider the relationship of plaintiff's claim to the other issues in the case. On remand, the court may determine pursuant to H.R.C.P., Rule 54(b), that there is no just reason for delay, and may expressly direct the entry of plaintiff's judgment then and there in accordance with this opinion. If this is done, then under H.R.C.P., Rule 62(h), the court is empowered to stay enforcement of the judgment so entered until disposition of other issues in the case. Alternatively, the court may withhold entry of judgment on remand of the case until all issues have been disposed of.

Even if judgment of foreclosure is entered on remand without delay, the question of plaintiff's right on the bond directly against the surety as a third party beneficiary for any deficiency that may arise shall be reserved for disposition when and if a deficiency is ascertained. As we hold in Part II of this opinion, the surety is or may be liable on the bond to the owners. It is a question of striking a balance between the parties. The amount of the surety's liability must be redetermined because of the manner in which the case was tried. The surety's liability to the owners includes indemnification against plaintiff's claim and others like it,[11] less such recoupment as the surety may be entitled to as more fully developed in Part II. Even if the surety's recoupment should wipe out its liability and foreclosure ultimately be carried out, there might be no deficiency. The lien in this suit involves only a $935 claim, there having been no consolidation of the several lien suits though the court found that there were others. In short, the case has been tried in such a way that we have before us only part of the picture.

In the interest of sound judicial administration we

---

[11] The bond here involved is one indemnifying the owners against liens, and not a mere indemnification against loss after it has been suffered. Cf., Stuart v. Carter, 79 W. Va.. 92, 90 S.E. 537. See 27 Am. Jur., Indemnity, §§ 20, 22; 42 C.J.S., Indemnity, § 14b.

should not anticipate and pass upon the matter of a deficiency judgment at this time. We direct that the point be reserved by the court below. Until and unless a deficiency is ascertained the question of the liability of the surety directly to the plaintiff will lie in the background. *Cf., Waterhouse Trust Co.* v. *King,* 33 Haw. 1, 25-26.

Plaintiff is not entitled to have this question of direct liability of the surety to it determined now. The principal reason for doing so would be to cut through the surety's defenses, assuming but not deciding that those defenses would not be good against plaintiff as plaintiff contends. But plaintiff did not adequately present this contention in the court below. Plaintiff did not move under H.R.C.P., Rule 12(f), to strike as insufficient against it the surety's fifth defense, which was that the surety had been released from its obligation on the bond by acts of the owners who, it was alleged, "altered and breached the building contract," and "made payments contrary to the assignment and power of attorney executed [to the surety] * * *." Under H.R.C.P., Rule 12(h), absence of such a motion did not preclude plaintiff from asserting the insufficiency of the defense at the trial. However, in the pre-trial order the court while listing the fifth defense as one of the "basic questions" raised by the surety, did not set out any contention on plaintiff's part that the defense was not good against it. The contention had been asserted in an earlier memorandum in the form of a quotation submitted in support of the general contention that there was a right to sue on the bond, and should have been pointed up in the pre-trial order if plaintiff intended to insist upon it. At the trial, the evidence as to the owners' acts came in without any objection on the part of plaintiff that this was irrelevant as to it. We think that such contention lay in the background and did not come to the fore. Finally, in a memorandum submitted after trial plaintiff did con-

tend that the surety's defenses "even if established are insufficient as a matter of law to defeat the plaintiff's claim," but this came at a time when the surety had no opportunity to reply. The court did not rule on the matter because the court did not sustain any of the surety's defenses even against the owners.

Upon this review of the record we conclude that the present case is not one in which an appellate court is called upon to advance into a point on which the court below has not ruled. Even if such a point tends to support the judgment, the appellate court should not rule on it unless "it is made clear beyond doubt that this could not prejudice the rights of the plaintiff in error." *Peck* v. *Heurich*, 167 U.S. 624, 629. *Cf., Waterhouse* v. *Capital Investment Co.*, 44 Haw. 235, 240, 353 P.2d 1007, 1012. Tied in with the surety's liability in the present case are its rights of subrogation,[12] and we are by no means satisfied that the surety would not be prejudiced were we to rule at this point on the question of its direct liability to the plaintiff. A case of this kind is one in which the issues should be made crystal clear before trial, in order that each party may plan its strategy.

## II.

### *Liability of Surety to the Owners.*

Before taking up the surety's defenses we further consider the form of the judgment appealed from. It awarded the owners judgment against the surety in the sum of $21,935.17, which was in addition to the amount of plaintiff's recovery and did not include the surety's potential liability on liens filed against the owners in seven other suits, totaling a further amount of over $14,000 according to the court's findings.

---

12 See 50 Am. Jur., *Subrogation*, § 49.

The owners concede an error of $10,287.30 in the judgment in their favor, inasmuch as the court itself ordered that the judgment "reflect the fact that Defendants Felix have not paid the amount of $10,287.30, being the last payment on the residence, due under the building contract," and the judgment did not reflect this. Moreover, the judgment failed to reflect the liability of the owners for extras, which the court fixed at $1000. Thus the judgment, if made to conform to the court's findings and conclusions, would be in the amount of $10,647.87, consisting in the following:

| | |
|---|---:|
| "Defects and Deletions" in the performance of the contract ($5136), and "additional defects ($1000) | $ 6,136.00 |
| "Advancements" | 7,314.47 |
| "Penalty" for delay in completion ($1725.00), and "interest" ($1711.50)[13] | 3,436.50 |
| "Attorney's fees" | 5,000.00 |
| Costs of court | 48.20 |
| | $21,935.17 |
| *Less:* Amount of last payment ($10,287.30) and amount fixed for extras ($1000) | 11,287.30 |
| | $10,647.87 |

The surety contends, as set out in its amended specification of error No. 5(a), that the court erred in consid-

---

[13] The court allowed $25 per day for delay in completion beyond the agreed 90 days, up to the date, December 1, 1962, when the owners took possession; and allowed interest at 6% on the entire amount of the judgment, other than the attorney's fees and interest, from December 1, 1962 to the date of judgment. We do not rule on these allowances, which as will appear went outside the proper scope of the issues brought to trial. We note, however, that the $25 per day penalty for delay was stipulated in the contract of March 19, 1962, not the contract of May 9, 1962 referred to in the bond; and that interest was allowed on damages for defects, deletions and delays, also on the amount of the advances, but none was allowed on the amount of the last payment (see Annots., 3 A.L.R. 809, 89 A.L.R. 678).

ering any damages of the owners other than damages suffered by them in regard to plaintiff's claim. The point is well taken. The record shows as follows:

No cross-claim was asserted by the owners against the surety until they filed their amended answer on October 11, 1963. The cross-claim set out the filing of plaintiff's lien; that this might entail payment by the owners of plaintiff's claim, costs and attorney's fees; that it had been necessary for the owners to incur attorney's fees and other costs and expenses in defense of the action; and that "there may be damages in addition to those herein above mentioned arising on account of the failure of Defendants EDWARD M. KIRK and SHUMAN LUMBER & SUPPLY Co., Inc. to fulfill and discharge their obligations under the above-mentioned Bond * * *," the terms of which had been set out in a previous paragraph. However, the prayer for relief was for damages "on account of the claims made by Plaintiff herein," and that an order be made requiring the surety "to hold them [the owners] harmless from all other liens, suits, actions or damages on account of said claims * * *." There were no allegations that any defects or deletions in construction had occurred, or that the contractor was liable for delays.

Before the filing of the amended answer which asserted the cross-claim, a pre-trial conference had been held. On the basis of this conference a pre-trial order was prepared and signed on October 22, 1963, stating under the heading "Nature of the Case" that "The nature of the case is for the purpose of foreclosing Mechanic's Lien No. 61 [plaintiff's lien], a notice of which has been given to the owners." On November 6, 1963, over objection of the surety, the owners obtained a modification of this order, and it thereafter was filed. The modification substituted the following for the original statement under the heading "Nature of the Case":

"The case will be heard for the purpose of determining the rights of the Plaintiff against the Defendant Contractor on his contractual obligations to the Plaintiff, against Defendants Albert M. Felix and Irene P. Felix as Owners of the property subject to Plaintiff's lien, and against Defendant Shuman Lumber & Supply Co., Inc. as bondsman, all on account of materials and work alleged to have been furnished in the improvement of the said Owners' premises at 1054 Ainako Avenue, Hilo, Hawaii."

It will be noted that, even as modified, the pre-trial order was confined to plaintiff's claim. It did not set out any claim on the part of the owners against the surety. Likewise, the surety's claim against the owners for the last payment was not set out in the pre-trial order or pleaded as a defense or counterclaim at any stage of the case.[14] While it is now contended by the surety that non-payment of the last installment called for by the contract is a defense, there is no such issue in the case at the present time. This matter has the same status as the owners' claim against the surety for damages. In short, the case was not so framed as to call for striking a balance between the owners and the surety.

However, it is conceded by the surety that the damages suffered by the owners in regard to the plaintiff's claim were within the scope of the issues brought to trial.[15] But

[14] According to the decision of the court below the surety, on April 11, 1963, just before the commencement of the action now under review, filed suit against the owners for the amount of the last payment, that is, $10,287.30, this being Civil No. 850, Circuit Court, Third Circuit, the same circuit in which the case now before us was instituted. We have not been furnished with the record in Civil No. 850, and do not know whether it is still pending. The court evidently took judicial notice that the surety had instituted such action.

[15] The surety argued in its opening brief that: "The theory of the cross-claim as the allegation and prayers indicate is to have the Defendant indemnify the Cross-claimants from whatever Judgment the Plaintiff may recover on the foreclosure suit and for damages that the Cross-

the surety interposed valid objections to the extension of the issues to encompass the owners' claims against the surety for damages on account of defects, deletions and delays in the construction of the residence contracted to be built.[16] By virtue of these objections the judgment

---

Claimants may suffer thereby. * * *"

While so construing the cross-claim, the surety made other objections thereto. We find no merit in the surety's contention that the cross-claim had to be personally served upon the surety, or in its contention that the amended answer which asserted the cross-claim required the leave of court for filing thereof. If leave was necessary, the court's subsequent rulings conferred it.

[16] The record shows that a decision was filed July 14, 1964, concluding that:

"* * * Judgment should be rendered in favor of the Plaintiff and against Defendants KIRK and SHUMAN LUMBER as prayed for, in the sum of $935.00, together with interest, costs of court, and attorney's fee.

"As to Defendants FELIX, the remedy against them is for the enforcement of lien. Hooper v. Lincoln, 12 H. 352.

"This Court also finds that Defendants SHUMAN Lumber and Defendant KIRK are liable to the Cross-claimants, Mr. and Mrs. Albert M. Felix, for damages, including costs and attorneys' fee incurred by them in defense of this action against the Plaintiff, and to hold Defendants FELIX harmless from all liens, suits, and actions as prayed for in their Cross-Complaint.

"Let Judgment be Entered Accordingly."

During the trial which preceded the rendering of this decision it was understood, as shown by the below excerpt from the testimony of A. M. Felix, owner, that the owners' general damages were not at issue. The following is from the proceedings of December 30, 1963:

"A   There was $2,000 yet unused from the third payment. However, since then there have been tremendous costs incurred as a result of this contract and now the $2,000 is gone and the contractor owes me a considerable lot of money and so does the bondsman.

"MR. ABE [Attorney for the Surety]: Your Honor, may I have the answer stricken as being non-responsive.

"(Last question and answer read back by the reporter.)

"THE COURT: I think that portion about 'contractor owes me money' perhaps should be stricken. It is the subject matter of another suit as I understand it. Am I correct?

"MR. NEVELS [Attorney for the Owners]: Probabilities are that there will be another suit.

"THE COURT: On that basis, I am going to sustain the objection, counsel."

On July 17, 1964, the case came on for the taking of additional evidence. The transcript of this hearing was not filed with the record, though the surety had obtained an order that the court reporter "prepare and furnish a transcript of the proceedings * * *." The surety noted in its opening brief that the transcript of this further hearing had not been filed, but failed to take steps to complete the record until after

recovered by the owners against the surety must be set aside. Mere correction of the judgment to reflect the $10,287.30 fixed as the amount of the last payment and the $1000 fixed as the amount of extras will not suffice. And we shall not proceed to dispose of the case as one involving only the amount of damages suffered by the owners in regard to the plaintiff's claim because as will appear there was error affecting even such a judgment; and because it would be inappropriate for this court to direct the entry of a judgment restricted in scope with the consequent splitting of the owners' cause of action when the judgment appealed from was not so restricted and opportunity should be allowed to amend.

The principal point for review is the surety's contention that it was and is entitled to be discharged altogether. This contention cannot be sustained. In this connection, three points merit consideration. A fourth point to be taken up is the matter of fees of the owners' attorney, and a fifth point is the matter of the proceedings to ensue upon remand of the case.

1. The surety contends that there can be no recovery by reason of the proviso of the bond reading as follows:

"Provided, however, that no suit, action or proceeding by reason of any default whatsoever shall be

---

argument on the merits, when a motion was made for permission to file the transcript of the further hearing. The court reserved its decision on this motion. It is granted at this time for the reason now stated.

Under H.R.C.P., Rule 16, a pre-trial order controls the subsequent course of the action, "unless modified at the trial to prevent manifest injustice." There was no modification of the pre-trial order subsequent to November 8, 1963 when it was filed. If the record remained in this state, the surety could stand on the pre-trial order. The owners' objection to the court being furnished the complete record at this time therefore is not valid.

The transcript of July 17, 1964, supports the surety's amended specification No. 5(a), showing the surety's objection that the matter at issue was "the extent of damages suffered by the particular claim which is the subject matter of this suit-claim of Honolulu Roofing Company versus Felixes and Shuman Lumber Company, defendants," and the allowance of a continuing objection along these lines.

brought on this Bond after 60 days from the date on which said contract is completed."

Amended specification of error No. 5(f) asserts that the trial court erred in finding and concluding "that the improvement called for in the contract had not been completed."

It is to be noted that the findings were that "the contract is not completed," and "the Contract was not performed according to the plans and specifications." The sixty day clause is tied to the completion of "the contract," to which the court directed its attention, not the completion of "the improvement," on which the specification of error was based. As stated in *Pacific Hardware Co.* v. *Lincoln,* 12 Haw. 358, 361:

"* * * The completion of the contract is not synonymous with the completion of the building. * * *"

The surety nevertheless contends that "the date on which said contract is completed" refers to the time when there has been "substantial completion of the improvement under the contract," such as to permit the contractor to recover on the contract.[17] The dwelling was substantially completed, it is argued, when the owners occupied it early in December, 1962, or at least when the owners filed their affidavit of publication of notice of completion under the mechanic's lien law on January 14, 1963.

R.L.H. 1955, section 193-42 of the mechanic's lien law, provides that publication of notice of completion "shall not be construed as an admission * * * that the improvement has been satisfactorily completed." And at the time when the owners commenced occupancy of the residence, they informed the surety that they did so because they had to vacate their old home, which had been sold, and

---

[17] As to the doctrine of substantial performance, see *Lansing* v. *Dondero,* 21 Haw. 736, 738-40; *Martin* v. *Karoh,* 142 Cal. App. 2d 468, 298 P.2d 635, 636-37; *Jerrie Ice Co.* v. *Cal-Flake Corp.,* 174 F. Supp. 21, 25; 13 Am. Jur. 2d, *Building and Construction Contracts,* § 41 *et seq.*

that the contract had not been completed. The mere commencement of occupancy did not signify that the owners waived their contention that there were defects in performance. 13 Am. Jur. 2d, *Building and Construction Contracts,* § 56; *Cf., Stewart* v. *Spalding,* 23 Haw. 502, 522-23 (architect's certificate reserving owner's right to hold the contractor responsible for defective work).

Under the court's findings in this case the contract work was not satisfactorily completed. The court found defects and deletions requiring $5136 to remedy them, and other defects and deletions impractical to remedy but depreciating the value of the house to the extent of $1000. While, under our holding that the issues brought to trial did not encompass the owners' claims for damages, these figures are not binding on the parties when it comes to striking a balance as to amounts owing,[18] the question of whether there were defects and deletions was at issue. Throughout the argument in this court the surety has not contended at any time that there were no defects or deletions.[19] As the case stands, we must take it to be the fact that the specifications of the contract were not met, though the amount involved is not necessarily as great as the court found, the amount not having been at issue.

In this situation even if the contract was substantially performed the contractor—in this case the surety as assignee of the contractor—had no right to recover the balance of the contract price, but only the price less a sum sufficient to compensate for defects. *Mackey* v. *Eva,* 80 Idaho 260, 328 P.2d 66, 69. Apart from the question of crediting the owners with the sums advanced by them (see *infra*), the amount to be deducted on account of de-

[18] Amended specifications 5(b) and (c), attacking the $5136 and $1000 amounts, have not been considered. Only the specification that the court went beyond the issues in the judgment it rendered in favor of the owners against the surety, No. 5(a), has been considered in this connection.

[19] The surety states in its brief: "There is no question that the dwelling in question has not been completed according to all the minute specifications of the building contract."

fects remained undetermined at the time of suit, and still is undetermined under our holding *supra* that the issues did not encompass this point.

As above noted, the language of the bond calls for determination of "the date on which said contract is completed," which is not the same as the date of completion of the work. In *Edgewood Knoll Apartments* v. *Braswell,* 239 N.C. 560, 80 S.E. 2d 653, 663, the court ruled that in the case of a bilateral contract, the contract "is not completed until fully performed by both parties." We are not prepared to go that far. We hold only that substantial performance by a contractor, when there are defects to be remedied and the amount to be paid remains undetermined because of the defects,[20] does not constitute completion of the contract within the meaning of a bond limiting the owners' time for suit on the bond. This is decisive of the surety's contentions under the sixty-day clause.

The surety argues that "it is common knowledge that no building is ever completed according to all the details of any plans or specifications." The argument is, in effect, that the limitation period specified in the bond will be nullified if "the date on which said contract is completed" is not given the meaning for which the surety contends. We do not agree. Our interpretation of the sixty-day clause does not nullify it. Suppose an owner accepts a building and makes the last payment, so that the contract definitely is completed. The sixty-day clause, if deemed reasonable,[21] would apply to any suit by the owners for

---

[20] It may well be true that immaterial deviations not entitling the owner to any adjustment of the price would not prevent the contract from being deemed completed. *Cf., Herman* v. *Dade Linen & Furniture Co.,* 143 So. 2d 878 (Fla. App.). At all events, this is not such a case.

[21] The time stipulated must be a reasonable time in which to commence the action. *Silverhorn* v. *Pacific Mutual Life Ins. Co.,* 23 Haw. 160, 162; 34 Am. Jur., *Limitation of Actions,* § 67; 17 Am. Jur. 2d, *Contractors' Bonds,* § 124; 72 C.J.S., *Principal and Surety,* § 263b; 53 C.J.S., *Limitations of Actions,* § 26.

latent defects, failure to discharge liens, or the like. But it would be most unreasonable for the sixty days to start running at the point when it could be said by hindsight that the work had been substantially performed.

We do not deem it material to consider in this connection the legislative policy as to when the time for filing mechanic's liens starts to run.[22] The interpretation of mechanic's lien statutes is based upon considerations inapplicable here, as illustrated by *Lansing* v. *Dondero, supra,* 21 Haw. 736, 740-41; *Delany* v. *Carpenter,* 114 N.Y.S. 990; *Coffey* v. *Smith,* 52 Or. 538, 97 Pac. 1079, 1081. Applicable in the present case is the principle that a provision limiting the time for suit against a surety on its bond is to be strictly construed against the surety. In *Lewis* v. *Hopper,* 140 Cal. App. 2d 365, 295 P.2d 93, 95, this principle was applied, and it was held that "completion of the work described in said contract" occurred when plaintiff installed four soap dispensers, the work taking four hours and being worth $100. The court noted cases holding that substantial completion was "completion" for purposes of the mechanic's lien law but did not decide whether or not those cases were dependent on the peculiar wording of the lien statute. This supports our view that cases which interpret mechanic's lien statutes as calling for filing of liens upon substantial performance of the work are not in point here. So in *Honeywell, Inc.* v. *Babcock,* —— Wash. 2d ——, 412 P.2d 511, where the time for suit on the bond ran from "the date on which Principal [general contractor] ceased work on said Contract," and it was established that the building was substantially completed on July 29, 1963, it was held that the action was timely on the ground that the owner, while

---

[22] There was no provision that "completion" should be as defined in the mechanic's lien statute. *Cf., Jew* v. *Pacific Employers Ins. Co.,* 196 Cal. App. 2d 310, 16 Cal. Rptr. 542.

moving into the new building on July 29, 1963, had required further work to be performed which subsequently was done by subcontractors, and: "The general contractor could not 'bring to an end' the building contract until his subcontractors had finished their work. The general contractor was responsible to the owner for the satisfactory and full completion of the subcontractors' work under the contract." (412 P.2d at 514.)

2. A total discharge is claimed by reason of alterations or changes made in the building contract. This is amended specification of error No. 5(e).

The parties contemplated changes in the contract. The contract of May 9, 1962, referred to in the bond, provided that all payments due under the contract were to be made through Shuman Lumber & Supply Co., "subject to such additions thereto and/or deductions therefrom as may be mutually agreed upon in writing during the progress of the work." The signatory parties were the owners and the contractor; so Shuman's agreement in writing was not required at this point for changes in the contract. However, as noted by the court below, the accompanying bond signed by the surety provided that it would not cover "any additions or extras to said contract unless such additions or extras are approved in writing by the Surety."

By letter of May 24, 1962, in response to a request for a first payment of $15,396.06, being 35 percent of $43,998.75, the contract price set out in the contract, the owners informed the surety that they had agreed with the contractor to supply the following: appliances; grading, filling and landscaping; fence; hot-house; drapes; carpeting; and fireplace accessories. The amount to be deducted for each was set out, the total deduction being $9,697.75. The letter concluded by stating, in effect, that the contract price was reduced to $34,291 and the first

payment to $12,001.85, that $1240 for salaries of workmen had been advanced to the contractor's brother, who was supervising the job, and that the sum approved as the first payment was $10,761.85. This sum was paid, and a second payment in the amount of $12,001.85 likewise was made.

The schedule of allowances was made a part of the contract through incorporation therein of the specifications, to which this schedule was appended. The amounts allocable to such items therefore cannot be disputed. Other changes made either were of the type within the contemplation of the parties or represented defaults on the part of the contractor. The case is governed by *Hustace* v. *Davis,* 23 Haw. 606, in which the court said:

> "* * * It is well settled that where a building contract provides that the owners shall have the right to order changes to be made in the work the sureties for the contractor are deemed to assent in advance to the making of the alterations, and if they are made, although they may be material, the sureties are not released thereby." (p. 610)

The court further said as to the necessity of written authorization where required by the terms of the contract itself, as distinguished from the bond:

> "* * * the reducing of a verbal order for changes in the work to writing is an immaterial formality so far as the surety on the bond is concerned and that the lack of a written order will not release him from liability. * * *" (p. 609)

See also 17 Am. Jur. 2d., *Contractors' Bonds,* § 27 at 211.

Of course, the owners are not in a position to assert non-liability for the extras by reason of the absence of a writing, upon a proper claim for the extras being asserted by the surety under the terms of the assignment,[23] if the

---

[23] The assignment is considered under point 3 *infra.*

formality of a writing has been waived. See 13 Am. Jur. 2d., *Building and Construction Contracts,* § 24. The owners apparently recognize the applicability of this rule. We note that the court below stated in the decision rendered July 14, 1964: "He [defendant Felix] told Harold Kirk [the contractor's supervisor] and Mr. Shuman that he expected to pay for additions and agreed to do so; that he, on the other hand, expected the Contractor and the Surety to perform what they agreed to do under the Contract, or else have them deducted from the final payment."

We note further that, were the owners to arrange to receive the benefit of work not called for by the contract, plans and specifications, and then deny liability therefor, that might introduce an element of prejudice and *pro tanto* discharge of the surety. But this is a matter of detail which does not concern us now. The record is inadequate for us to indicate at this time what should and what should not be treated as items for which the owners are liable upon remand of the case.

3. It further is contended that the surety is entitled to a total discharge by reason of payments made by the owners to the contractor or others in a manner deviating from the terms of the contract. This is amended specification of error No. 5(f).

As seen, the contract itself provided that the owners would make their payments to Shuman. Moreover, at the time of execution of the bond an instrument called "assignment and power of attorney"[24] was executed, whereby the contractor assigned to Shuman "all moneys now due and payable or that may hereafter become due and payable to the Contractor on, under, by virtue or in respect of that certain contract dated May 9, 1962, made between Mr. and Mrs. Albert M. Felix and the Contractor for

---

[24] This instrument is referred to herein as the "assignment."

Forty-Three Thousand Nine Hundred Eighty-Eight & 75/100 ($43,988.75) * * * (a duplicate copy of which contract is hereto attached and made part hereof) together with all moneys now due and payable or that may hereafter become due and payable to the Contractor for extra work and/or extra material now or at any time hereafter furnished by the Contractor pursuant to the terms of said contract and/or any alteration or modification thereof." The owners signed an agreement endorsed on the instrument, whereby they acknowledged receipt of a copy and agreed "to make all payments as therein provided."

Since this assignment merely covered the moneys due under the contract, which contained a schedule of allowances of which the owners availed themselves as above set forth, we find no error in the court's conclusion that the surety was entitled to only $34,291 under the assignment, plus extras. The payments made to Shuman, the surety, as agreed, totaled $22,763.70. The remaining amount, $11,527.30, was paid to others or not paid at all. According to the court's findings[25] the payments made to others were:

| Date | Amount | Person Receiving Payment |
|---|---|---|
| May 25, 1962 | $1240.00 | Contractor[26] |
| June 23, 1962 | 245.00 | Charles Ishii[27] |
| July 20, 1962 | 1100.00 | Contractor |
| August 17, 1962 | 1400.00 | Contractor |
| September 4, 1962 | 1069.00 | Contractor |
| September 14, 1962 | 1150.00 | Contractor |
| November 13, 1962 | 190.00 | Hilo Iron Works |
| December 1, 1962 | 200.00 | Wallace Izumi |

[25] In a few instances the findings did not set out the dates of payment. However, they appear in the record.

[26] As seen, this sum was deducted by the owners from the first payment, making the first payment $10,761.85 instead of $12,001.85. The second payment was $12,001.85. Of the remaining $11,527.30, $1240 represents the reduction of the first payment made by the owners, while $10,287.30 represents the last payment due under the contract.

[27] As noted on the receipt for this item, $90 of this amount, itemized as for "compressor," was ordered stricken at the hearing of July 17, 1964 on the ground it was not sufficiently shown what this meant. The court evidently overlooked this ruling in making its findings.

| December 5, 1962 | 1089.00 | S. McCabe Paving Co. |
|---|---|---|
| December 5, 1962 | 200.00 | M. Iyo |
| December 6, 1962 | 35.98 | M. Iyo |
| December 24, 1962 | 143.97 | Wallace Izumi |
| December 30, 1962 | 180.09 | M. Iyo |
| February 5, 1963 | 311.43 | Hawaii Hardware |
| | $8554.47 | |

After applying the $1240 payment of May 25, 1962 on the first payment due under the contract—as did the owners according to their letter to the surety dated May 24, 1962 but evidently mailed a little later—the court allowed the balance of $7314.47 as "advancements" for which the surety was "indebted" to the owners, the court further stating that the judgment would reflect the fact that the last payment of $10,287.30 had not been made. As above set out, the judgment failed to reflect this fact.

Under our holding above set out that the issues were not so framed as to call upon the court to strike a balance between the owners and the surety, the only point squarely at issue was whether or not the surety was entitled to a total discharge *ipso facto*. The surety was not so entitled. This court, in *Hustace* v. *Davis, supra,* 23 Haw. 606, 612, held that:

"* * * As to the latter [departure from the terms of the contract relating to the method of procedure or performance in the manner of carrying out the contract], deviations will not result in the release of the surety unless they tend to prejudice his rights. [Citations.] An immaterial deviation from the terms of the contract in the matter of making payments will not release the surety on the bond. * * *"

The court in *Hustace* did not distinguish between a compensated and an accommodation surety, although the record of the case shows that the surety, the appellee, endeavored to make the point that he was an accom-

modation surety, arguing that he had been ready to prove it but the evidence had been rejected on objection of the owner. Previously, in *Hackfeld & Co. v. Medcalf,* 20 Haw. 47, 53, a case involving the suretyship contract of a wife, the court had required "literal compliance with the terms and conditions upon which the wife became a surety."

Many courts make a distinction between a compensated and an accommodation surety in respect of deviations from the contract in the matter of payments, applying the rule of *pro tanto* discharge to the extent of the prejudice suffered in the case of a compensated surety, as illustrated by *Young Men's Christian Ass'n v. United States Fidelity & Guaranty Co.,* 90 Kan. 332, 133 Pac. 894, *modified on rehearing,* 92 Kan. 467, 140 Pac. 892; *Corporation of President of Church of Jesus Christ of Latter Day Saints v. Hartford Acc. & Indemnity Co.,* 98 Utah 297, 95 P.2d 736, 741; *National Union Indemnity Co. v. Bass,* 369 F.2d 75 (5th Cir., applying Mississippi law); *United States v. Duby,* 201 F.2d 300 (9th Cir., applying Washington law); Annot., 127 A.L.R. 10, 69. Under these cases the surety has a right of recoupment reducing the damages to the extent of the prejudice suffered.

Is the surety here involved a compensated surety? The surety argues that the owners failed to allege consideration for the execution of the bond by the surety and that the cross-claim was defective in this regard. This point is without merit, but the question of the surety's status—whether a compensated or an accommodation surety—requires consideration. In the Restatement a surety is not treated as a compensated surety merely because it receives some pecuniary advantage from the undertaking; only one in the business of executing surety contracts for a premium is treated as a compensated

surety. Restatement, *Security,* § 82(i). While there is some support for that view, *e.g., City of Philadelphia* v. *Philadelphia Gas Works Co.,* 49 Pa. D. & C. 314, 320-21, we are of the opinion that the better rule is that a lumber company executing a bond as surety for a contractor in order to become the supplier of lumber to the contractor, is to be treated as a compensated surety. *Mathes* v. *Stewart,* 249 Ill. App. 558; *cf., Stephens* v. *Elver,* 101 Wis. 392, 77 N.W. 737, 740. That rule applies here. In accord are cases holding that officers, directors and stockholders of a bank who execute a bond as sureties to indemnify a depositor, such as a city, against loss from the deposits made by it, are not entitled to be treated as gratuitous sureties. *Vogel* v. *City of Vinita,* 170 Okla. 235, 39 P.2d 94, 96-97; *Overly Special School District* v. *Haber,* 193 Wis. 403, 214 N.W. 342, 343-44; *Standard Acc. Ins. Co.* v. *Mueller,* 291 Ill. App. 56, 9 N.E.2d 361, 363-64; *Holmes* v. *Elder,* 170 Tenn. 257, 94 S.W.2d 390, 392. Similarly, it has been held that a vendor who guarantees his buyer's payments in order to use the buyer's contract as part consideration for another deal is not a gratuitous surety, *Rose* v. *Ramm,* 254 Mich. 259, 237 N.W. 60, 61. We conclude that if there is a distinction to be made between an accommodation and a compensated surety, Shuman is the latter and only a *pro tanto* discharge is involved.

We recognize that in some cases the prejudice suffered by a surety when advance payments are made may be larger than the amount of such payments, due for example to the removal of the contractor's incentive to finish the work in order that he may qualify for the last payment. However, on this record we are not concerned with any such matter. *Cf., Globe Indemnity Co.* v. *Southern Pacific Co.,* 30 F.2d 580 (2d Cir.).

The court below found that owner A. M. Felix, by letter of September 17, 1962, notified the surety of the

advances made to the contractor and of his intention to continue to make payroll advances unless he heard from the surety otherwise. The court further found: "Mr. Felix has written Defendant Shuman on numerous occasions on the progress of the building, and the advances he made from time to time. In addition thereto, he telephoned Mr. Shuman on many occasions, also." As to the latter finding, we note that it is not clear when the mentioned telephone conversations occurred or the subject matter of the conversations. Of particular interest is the question of whether they related to the matter of payroll advances or indeed any advances to the contractor. The court stated in the decision that: "According to Defendant Felix, he made advances to the employees in order to keep the men on the job; that Defendant Shuman was notified of the advancements." But the court made no finding that the surety was informed of the advances made to the contractor other than by the letters of May 24, 1962 and September 17, 1962, which are in evidence.

The court at another point found that: "I am satisfied that Defendant Shuman at no time prior to September 17, 1962, did ask Defendant Felix not to make advances"; that the surety "has not sustained the burden of proving its defense of material alterations or payments contrary to the terms of the contract"; and that the surety "by its acts and conduct waived its right to claim release from the Bond." The owners were credited with all of the advancements made.

The court further found "that all of these advancements were utilized for construction of the house and that none were used for 'extras'." It, of course, is true that aside from the questions involved in the special situation exemplified by the July and August payments considered below, the owners ordinarily would be entitled to credit for payments which satisfied claims for labor or materials

for which the surety otherwise would have been liable. See *Sandusky Grain Co.* v. *Borden's Condensed Milk Co.*, 214 Mich. 306, 183 N.W. 218, 221; *Ardsley* v. *United Pacific Ins. Co.*, 74 Nev. 377, 332 P.2d 1000, 1001; Annot., 127 A.L.R. 10, 55. However, the matter of credit for the advancements does not turn merely on the question of whether the items paid by the owners were all proper items under the contract, as to which there is some room for dispute.[28] Other considerations aside, we are of the opinion that the court erred in its approach to this matter. The court overlooked the assignment altogether. Except as to payments made at the request of the assignee,[29] the owners acted at their peril when they made payments to persons other than the assignee, who was also the surety. *Howard* v. *Public Schools of the City of Holland,* 50 Mich. 94, 14 N.W. 712; 13 Am. Jur. 2d, *Building and Construction Contracts,* § 92; 6 Am. Jur. 2d, *Assignments,* § 112. The burden was on the owners[30] of showing that they were entitled to credit for the payments that, contrary to the terms of the assignment, were made to the contractor and others.[31]

---

[28] We refer to the fact that some of the payments (a "small proportion" according to the court below) were for the redoing of defective work. The extent and amount of the defective work for which the surety is responsible will be for determination on the remand of the case, this not having been within the issues brought to trial under the pleadings and pre-trial order.

We refer also to the $90 item which the court itself ordered stricken, but subsequently included in the amounts credited to the owners.

[29] It is not necessary that we review the findings as to such requested payments at this time. However, we note that there is no finding that the surety had requested the July and August, 1962 advancements considered below.

[30] In view of the assignment, the owners had to show payments which in fact or in law were in satisfaction of the assignment, or estoppel to rely on the assignment. Whichever approach is taken an affirmative defense is involved. H.R.C.P., Rule 8(c).

[31] We note that the court seems to have treated the money advanced by the owners from and after June 23, 1962, computed at a total of $7,314.47, as money loaned, and not as advance payments on the last installment. However, the owners themselves, in their letter to the surety of September 17, 1962, characterized the payments theretofore made to

Furthermore, the assignment represented security for the surety. The question is one of release by the owners of moneys payable to the surety both under the terms of the assignment accompanying the bond and under the provisions of the contract itself. In other words, it is a case where there has been a release of security in which the surety had rights. This approach has been applied even when the rights of the surety were not spelled out, as in *State* v. *Shain,* 334 Mo. 153, 66 S.W.2d 102, 106; *Kiessig* v. *Allspaugh,* 91 Cal. 231, 27 Pac. 655. We need not pass on that situation[32]—here the rights of the surety were express, both under the terms of the assignment accompanying the bond and under the provisions of the contract itself. The failure to retain and ultimately pay over to the surety the moneys due in accordance with the agreed terms of the surety's liability operated as a *pro tanto* release, in the absence of special circumstances calling for a deviation from this general rule. *Cf., Paxton* v. *Spencer,* 71 Utah 313, 265 Pac. 751, 755-56; *Metropolitan Casualty Ins. Co.* v. *Koelling,* 57 So. 2d 562 (Miss.).

As held in *Holzinger* v. *Goo,* 36 Haw. 506, 510, citing Stearns, *Suretyship,*[33] the creditor (the obligee on the

the contractor (other than the May payment which was not included in the $7,314.47) as "advanced on the third increment."

Under the terms of the assignment and bond the owners would not be entitled to credit for the payments against the surety if the payments were viewed as mere loans to the contractor, except as a different result might follow upon consideration of the uses and purposes to which the money was put. *Cf., Museum of Fine Arts* v. *American Bonding Co.,* 211 Mass. 124, 97 N.E. 633. On the other hand, if these payments were viewed as money loaned to the surety then the burden again rested on the owners of showing that such sums were so borrowed.

[32] See *Sproul Construction Co.* v. *St. Paul Fire & Marine Ins. Co.,* 74 N.M. 189, 392 P.2d 339, 341, and *Steck* v. *Home Indemnity Co.,* 74 N.M. 419, 394 P.2d 267, 268, which distinguish *Morgan* v. *Salmon,* 18 N.M. 72, 135 Pac. 553, the latter being a case in which retention of a certain percentage was required by the bond and made a condition of the surety's liability. See Annot., 127 A.L.R. 10 §§ IIa(4) and (5).

[33] In *Holzinger* the court quoted the third edition of the cited text, § 99. Compare the fifth edition, §§ 6.48 and 6.49, where the author makes a distinction between passive inactivity and active negligence. We need not decide whether such a distinction is sound.

bond) has a duty to exercise ordinary diligence in preserving security under his control which is applicable to the debt for which another is surety. A voluntary release of security held by a creditor or obligee in which the surety has rights will discharge the surety to the extent of the security released, unless the surety has suffered no detriment. Stearns, *Suretyship,* § 6.46 (5th ed.). Of course, under ordinary principles,[34] a party may be estopped by his failure to object to expenditures made by another party, but this rests upon the circumstances. In the present case the findings of the court are not sufficiently specific to show estoppel of the surety to assert its rights under the assignment as to at least some of the advances. We now develop this point insofar as it bears on the question of *pro tanto* release of the surety. We shall confine our attention to the payments made by the owners to the contractor in July and August, 1962. It will not be necessary to review all of the payments made by the owners, inasmuch as we have before us only the question of the surety's right of recoupment against the owners' claim on account of plaintiff's lien. As seen, we do not have before us the whole matter of striking a balance between the owners and the surety.

The payments made by the owners, to the contractor in July and August, 1962, which were for payroll, may have resulted in a duplication of payments, due to the surety also having made payments to the contractor for payroll. The court did not rule on this point, merely stating that the surety had not sustained its burden of

[34] See 28 Am. Jur. 2d, *Estoppel and Waiver,* § 55; *Kaui* v. *Kauai County,* 47 Haw. 271, 278, 386 P.2d 880, 884; *Coelho* v. *Fernandez,* 46 Haw. 578, 582, 384 P.2d 527, 530; *Munoz* v. *Commissioner of Public Lands,* 40 Haw. 675, 688; *Hewahewa* v. *Lalakea,* 35 Haw. 213, 218-20; *Gushiken* v. *Shell Oil Co.,* 35 Haw. 402, 421-22; *Robinson* v. *McWayne,* 35 Haw. 689, 732-39; *Hata* v. *Dean Witter,* 32 Haw. 760, 765-66; *Kapiolani Estate* v. *Thurston,* 17 Haw. 312, 317-19; *Peabody* v. *Damon,* 16 Haw. 447; *Nahaolelua* v. *Kaahu,* 10 Haw. 18, 21; *MacFarlane* v. *Damon,* 10 Haw. 495, 497-98.

proof and finding a waiver. As seen, in so ruling the court overlooked the assignment.

As to the August 17, 1962 payment it does not even appear that the money paid to the contractor actually reached the employees. But even if both payments went to satisfy just claims for labor, it appears that the surety paid out to the contractor on July 30, 1962 the sum of $1500 for the July 20, 1962 payroll, and on August 18, 1962 the sum of $1350 for payment "in full" of all labor to that date on the Felix job, thus presenting a question of duplication of payments as above noted. The findings of the court do not take into consideration many pertinent questions. For example, one of the owners, A. M. Felix, testified that the payrolls "were made up to Friday and paid on Saturday." While it is not clear whether this was true in July and August, 1962, it is noteworthy that each of the July 20, 1962 and August 17, 1962 payments by the owners was made on a Friday. On what dates, other than May 24, 1962 and September 17, 1962, was notice given to the surety of the various advances made? Was immediate notice given to the surety of the moneys advanced by the owners to the contractor and their purpose? At the time when the surety made its July 30, 1962 and August 18, 1962 payments, was it aware that payroll payments were being made by the owners without waiting for a reasonable period[35] for the surety to make them? The findings are not specific on these points.

As has been stated, an obligee on a bond has a duty of prudence in preserving security under his control. On the previous occasion of a payroll advance made by the owners in May, 1962, immediate notice of the payment was given to the surety. As to the advancements in ques-

---

[35] R.L.H. 1955, § 95-1, as it read at the time, *i.e.*, as amended by S.L. 1957, c. 137, provided that earned wages "shall be due and payable within fifteen days after the end of each pay period * * * ."

tion, *i.e.*, the July and August payments, the first notice may have been by the letter of September 17, 1962 from the owners to the surety. Meanwhile, the surety had made payments on July 30 and August 18, 1962, as above set out. On July 18, 1962 the owners had addressed the surety stating many complaints, but not stating that the owners proposed to repudiate the assignment.

We therefore conclude that while the surety is not entitled to a discharge *ipso facto,* as distinguished from the striking of a balance between the parties, the court erred in its determination of the credits to which the owners are entitled. This is true not only because the court went beyond the issues that were before the court for trial, but also because the court's findings failed to take into account the assignment and the burden resting on the owners of showing that they were entitled to credit for the payments they made contrary to the terms of the assignment. The amount to be credited to the owners for these advancements will be an open question upon remand of the case.

4. The surety, by amended specification of error No. 5(h), has attacked the trial court's allowance of a $5000 fee for the owners' attorney. This again is outside the issues properly brought to trial, except insofar as the fee was allowed for services in connection with plaintiff's claim. But since the point will arise on remand of the case we will consider it.

It appears that the $5000 fee was for all of the services of the owners' attorney, including not only services in defending the owners against plaintiff's lien but also services in seeking recovery on the bond. The fee for the latter was not within the coverage of the bond.

As to the former—the services in defending the owners against plaintiff's lien—the provisions of the bond calling upon the surety to deliver the work "free from

all liens and claims and without further claims and without cost, expense or charge to the Owner" other than that provided in the contract, also to "hold and save the Owner * * * harmless from all liens, suits, actions or damages of every nature and kind arising or caused from or on account of any failure on the part of the Principal * * *," covered not only indemnity against the fee of plaintiff's attorney, which was part of plaintiff's statutory claim against the owners' property, but also the reasonable fee of the owners' attorney in defending against plaintiff's claim, necessitated by the surety's denial of liability under the bond.[36] *Cf., Frommeyer* v. *L. & R. Construction Co.,* 261 F.2d 879, 881 (3d Cir.); *Fausett Builders* v. *Globe Indemnity Co.,* 220 Ark. 301, 307, 247 S.W.2d 469, 472 (dissenting opinion).

As to the latter—the services in seeking recovery on the bond—a different situation is presented. R.L.H. 1955, § 219-16.5, as amended by S.L. 1959, c. 218 (Supp. 1965), specifically provides in the third paragraph of the section that: "Any law to the contrary notwithstanding, no such attorney's fee shall be allowed to the plaintiff by any court: (a) if prior to or at the time the debt was incurred, the debtor did not sign an instrument in writing which provided for the payment of an attorney's fee; * * *." The word "such" refers back to the first paragraph of the section, which provides for an award of an attorney's fee where action is instituted on a written contract which "provides for an attorney's fee." The intent of the above clause (a) of the third paragraph is to add

---

[36] As has been noted *supra, circa* note 10, we do not have before us and do not rule on the question of whether the entire amount of the fee of plaintiff's attorney may be recovered over on the owner's claim against the surety. There possibly is involved the question of whether the owners unduly complicated the proceedings and unreasonably increased the work called for, which question may have bearing not only on the amount recoverable by the owners as constituting the fee of plaintiff's attorney, but also on the amount of the fee of the owners' attorney for his work in defending against plaintiff's claim.

to the authorization contained in the first paragraph a positive prohibition against the recognition of a contractual obligation for an attorney's fee of a plaintiff unless the conditions of said clause (a) are met. As stated in the report of the House Committee on Judiciary on H.B. 1204, which became S.L. 1959, c. 218, *supra* (Stand. Com. Rep. 103, House Jour., Regular Session of 1959, p. 617), the purpose is to prohibit the collection of attorney's fees when not provided for in an instrument in writing. This makes applicable the reasoning of the Montana court in *Federal Surety Co.* v. *Basin Construction Co.,* 91 Mont. 114, 5 P.2d 775, 778, that the obligee on the bond cannot recover, as damages covered by the bond, the expense incurred for an attorney's fee in enforcing the bond. There is no room under our statute for adoption of the different view taken by some of the cases. See Annot., 69 A.L.R. 2d 1046. However, the statute is not applicable to the attorney's fee reasonably incurred in defending against the claim. The latter situation is comparable to that of an insurer who unjustifiably refuses to defend an action against the insured. See 29A Am. Jur., *Insurance,* § 1460.

The $5000 fee having been allowed as a lump sum, without distinguishing between the services of the owners' attorney in defending against plaintiff's claim and his services in seeking recovery on the bond, it will be necessary for the court below to determine what is a reasonable fee for the former. As to the latter, R.L.H. 1955, § 219-14, governs.

5. Upon remand of the case it will be the duty of the court below to set aside the judgment awarded the owners (as well as that awarded the plaintiff concerning which we have ruled in Part I). It further will be the duty of the court to make appropriate orders providing for such amended and further pleadings as the parties may desire to file, consistent with this opinion. It is manifest that

there are many issues arising from the bond and assignment that have not been pleaded or brought to trial. Our consideration of the case so far has brought to light the following: (1) The right of the surety to recover the amount of the last payment under the assignment made to it; (2) the right of the owners to be credited with the payments made by them to persons other than Shuman, the assignee, by reason of the same having been requested by Shuman, or by reason of Shuman having suffered no detriment through such payments or being estopped to stand on the assignment; (3) the liability of the owners for work done that was not provided for by the contract; (4) the liability of the surety for defects, deletions and delays in the performance of the contract; (5) the right to interest, if any; (6) the amount recoverable by the owners as indemnity against liability for plaintiff's claim; and (7) the amount recoverable by the owners on account of the attorney's fee reasonably incurred by them in defending against plaintiff's claim. In summary, the striking of a balance between the owners and the surety, taking into consideration the amount of the last payment and all of the other claims and defenses arising out of the bond and assignment, was not a matter brought before the trial court, and further proceedings in respect thereto are dependent upon the reshaping of the issues.[37]

We have not adverted heretofore to the surety's motion to disqualify the trial judge, which is the subject of both amended and original specification No. 3. We agree with the ruling below that the motion was not timely. R.L.H. 1955, § 213-3(b) (Supp. 1965), under which the motion was made, requires filing of the disqualifying affidavit

---

[37] As seen (n. 14), the court below took judicial notice that an action had been instituted by the surety to recover the amount of the last payment. We do not know whether said action is still pending. At all events, when two actions are pending the first one to be instituted does not necessarily take precedence. See 1 Am. Jur. 2d, *Abatement, Survival, and Revival,* § 7 et seq.

"before the trial or hearing of the action or proceeding," or in the alternative that "good cause shall be shown for the failure to file it within such time." As this court stated in *In re Bouslog,* 41 Haw. 270, 274, it is required that the filing precede the hearing of contested preliminary motions, if any, unless the failure to file within such time is excused for good cause.

It is argued here that until the filing of the cross-claim and until the court's ruling that it would entertain the same, made by denial of the surety's motion to dismiss the cross-claim, the surety had no occasion to seek the disqualification since it was based on the relationship between the trial judge and owner A. M. Felix as fellow judges; that the owners and the surety were on the same side until the court entertained the cross-claim; and that the surety could not have sooner moved to disqualify the trial judge for bias and prejudice in favor of said A. M. Felix. It is true that in order to disqualify a judge for bias or prejudice in favor of a party that party must be an "opposite party," under the terms of the statute. But after careful review of the record we cannot accept the contention that the surety was entitled to await a ruling on its motion to dismiss the cross-claim before making the suggestion of disqualification.

The record shows that the cross-claim was filed on October 11, 1963. On October 19, 1963, the owners joined with the plaintiff in addressing interrogatories to the surety, to which the surety objected on October 30, 1963 on the ground that "under the pleadings it does not appear that said Albert M. Felix and Irene P. Felix are adverse parties to Defendant Shuman Lumber & Supply Co., Inc." On November 6, 1963, the surety appeared and argued a motion made by plaintiff and the owners to strike this objection, which motion was granted. Furthermore, on November 6, 1963 the surety noted its objection to the

modification of the pre-trial order, which then was filed. As above noted this modification was submitted by the owners. Thus, on November 6, rulings adverse to the surety were received on matters litigated between the surety and A. M. Felix. As stated in *In re Bouslog, supra*:

"Unless the matters of disqualification are unknown to the party at the time of the proceeding and are newly discovered, there can be no excuse for delaying the filing of the suggestion until after rulings are made in the matter, particularly where such rulings may be considered adverse to the movant." (p. 274)

Again, on November 8, 1963 the surety appeared and argued the motion to dismiss the cross-claim, which motion had been filed October 30, 1963. This motion likewise was denied. The disqualification motion, made November 21, 1963, came too late.

However, after the ruling against the disqualification motion the trial judge sua sponte raised and took under advisement the question "whether or not the best interest of justice for both parties would be subserved if I withdraw from this case." The judge announced on November 29, 1963 that in the interest of justice and fairness to all parties concerned it was his feeling that he should not disqualify himself on his own motion. We now direct our attention to this feature of the case. However the case may have appeared to the trial judge at the time, our concern now is with the proceedings that will ensue on remand of the case.

It is evident from the proceedings already had that owner A. M. Felix is a principal witness in the case and that questions of conflicting testimony have arisen and may again arise. The judge who heard the case and A. M. Felix are the only two circuit court judges in the County of Hawaii, which constitutes the third circuit. One would expect the two judges to be associated constantly or as

averred by the affidavit suggesting the disqualification "they have enjoyed mutual companionship and comradeship, brought about by constant communication and conferences between the two * * *." Moreover, this is not a large community. The population of the county is about 59,000, while the population of the city of Hilo where the court sits is about 25,000.

R.L.H. 1955, § 213-3(b), *supra,* provides that: "Any judge may disqualify himself by filing with the clerk of the court of which he is a judge a certificate that he deems himself unable for any reason to preside with absolute impartiality in the pending suit or action." As stated in *In re Bouslog, supra,* 41 Haw. 270, 283:

"A judge owes a duty not to withdraw from a case —however much his personal feelings may incline him to do so—where he is not legally disqualified, yet there may be circumstances that cast suspicion on the fairness of the judge proceeding in the case so that it may be advisable for a judge not technically disqualified to withdraw *sua sponte.*"

We have arrived at the conclusion that the circumstances of this case are such that we should direct the second judge of the third circuit to recuse himself as to all further proceedings in this case, and we do so direct.

Remanded with directions to set aside the judgment, and for further proceedings consistent with this opinion.

*Kazuhisa Abe* for Shuman Lumber & Supply Co., defendant-appellant.

*L. N. Nevels, Jr. (Nevels & Chang* of counsel) for Albert M. Felix and Irene P. Felix, defendants and cross-claimants-appellees.

*James Wohl (W. Lawrence Clapp* on the brief, *Carlsmith, Carlsmith, Wichman & Case* of counsel) for plaintiff-appellee.